IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| TRACY BROADCASTING CORPORATION, | ) Case No. 8:06-CV-00581 <br> ) <br> ) |
| Plaintiff, | ) |
| v. | ) <br> ) |
| SPECTRUM SCAN, LLC, | ) <br> ) |
| Defendant, | ) <br> ) |
| v. | ) <br> ) |
| MICHAEL TRACY, | ) <br> ) |
| Counter-Defendant | ) <br> ) |

PLAINTIFF AND COUNTER-DEFENDANT'S
PRE-TRIAL BRIEF

Tracy Broadcasting Corporation and Michael Tracy, Plaintiff and Third-Party Defendant in the above-captioned matter, by and through their counsel of record, submit this Brief of issues expected to arise at trial:

I.

CONTRACT ISSUES

A. *Contract Interpretation*

As this Court has already noted, Kentucky contract law governs in this case. The Plaintiff and Counter-Defendant has set forth the law governing this issue in the Brief previously filed in support of their Motion for Summary Judgment (Filing No. 64), and incorporates that

1

discussion herein by reference. For purposes of this Pretrial Brief, a few propositions are worth restating.

The construction of a contract and the determination of its legal effect are the province of the Court in Kentucky. *Morganfield Nat. Bank v. Damien Elder & Sons*, 836 S.W.2d 893, 895 (Ky. 1992). "To be legally enforceable, an agreement must 'contain definite and certain terms setting fort promises of performance to be rendered by each party'". *Quadrille Business Systems v. Kentucky Cattlemen's Association, Inc.*, 242 S.W.3d 359 (Ky.App., Dec. 28, 2007) (quoting *Kovacs v. Freeman*, 957 S.W.2d 251, 245 (Ky.1997)). Plaintiffs must show by clear and convincing evidence that an actual agreement existed between the parties, which, to be valid, must set forth the essential terms of the deal. *Id.* (Quoting *Auto Channel Inc. v. Speedvision Network LLC*, 144 F.Supp.2d 784, 790 (W.D.Ky. 2001)).

Plaintiff maintains that the February 14, 2004 Agreement between Plaintiff and Defendant is vague and ambiguous and deficient in certain respects. Plaintiff maintains that the language of the Agreement is defective and leads to numerous construction problems, to wit:

1. There is no term or length of contract in the Agreement. This Court has found that the term will be what is reasonable under the facts and circumstances of this case.

2. The Agreement does not contain a definition of "highest offeror". Assuming the term is three (3) years from the issuance of the Construction Permit, how can Plaintiff know, at any specific period of time during the term, that a purported offer is the "highest offer". Logically, you can only determine whether a specific offer was the "highest offer" at the conclusion of the term of the Agreement. To put it more specifically, how could Plaintiff know that a purported offer on August

2

12, 2005 was the "highest offer" when the reasonable term of the Agreement had not expired. What if a higher offer comes in on November 1, 2005, before the first offer is closed? Which is the "highest offer" under the Agreement? Would accepting the August 12, 2004 offer subject Plaintiff to liability to Defendant when the higher offer comes in? This example illustrates the problems caused by the lack of definitiveness in the language of the Agreement.

3. The Feburary 14, 2004 Agreement specifically provides in paragraph 3(A) that the "Owner will sell KMOR to the highest offeror". The Agreement goes on to state that "[A]ny purchase of KMOR would be made pursuant to the terms and conditions of a *Definitive Purchase Agreement* which would contain all customary representations, warranties, covenants and conditions, and which would be in form and substance reasonably satisfactory to the Owner and the purchaser". Please note that there is no provision in the Agreement providing for the use of a "Letter of Intent" as a precondition to the execution of a Definitive Purchase Agreement. Thus, the Agreement is not satisfied unless Owner receives an offer pursuant to a Definitive Purchase Agreement. Plaintiff was never furnished with a Definitive Purchase Agreement to consider.

### B. Breach of Contract Issues

Defendant has alleged that Plaintiff has breached the February 14, 2004 Agreement by, *inter alia*: (1) refusing to sell the KMOR radio station license to the highest offeror; and (2) by its alleged merger into an entity known as "Tigre Broadcasting Company." The following points are important in the Court's consideration of these issues.

## Letter of Intent

The testimony of several witnesses at trial will demonstrate that a Letter of Intent is basically an invitation by a potential purchaser to negotiate. A Letter of Intent **does not** bind or legally obligate a potential purchaser to go forward to the execution of a Definitive Purchase Agreement. The potential purchaser has the ability, for any reason, to not go forward with any purchase. Additionally, the Seller does not have the ability under a Letter of Intent to force the proposed purchaser to go to a Definitive Purchase Agreement.

The specific Letter of Intent which Defendant will urge this Court to adopt as a "highest offer" is the Lakeshore Media Letter of Intent dated August 12, 2004. (Exhibit "58"). This Letter of Intent includes numerous contingencies and requirements prior to it ever arising to the level of enforceability such as:

1. There is no non-refundable earnest money deposit at the time the Letter of Intent is executed. A deposit is only made upon the execution of a "Definitive Purchase Agreement". The Seller has no security at this point if the Buyer later chooses not to go through with the deal.

2. The Letter of Intent (paragraph 7) requires the Seller to "cease entertaining any additional offers and will stop negotiating with any other party for the sale of the station". Thus, even thought Seller cannot count on the Letter of Intent progressing to a Definitive Purchase Agreement, the Seller is required to cease trying to sell the radio station.

3. Paragraph (6) of the Letter of Intent from Lakeshore Media provides that the potential Buyer has 45 days to conduct due diligence by reviewing Seller's business records. Thus, if the potential Buyer decides, based upon the review of the

4

Seller's business records, that it is no longer interested in the purchase, there is absolutely nothing Seller can do to force a sale under the Letter of Intent.

4. Paragraph ten (10) provides that the parties essentially had 45 days from the Letter of Intent date to negotiate, prepare and sign a Definitive Purchase Agreement. If no such Definitive Purchase Agreement is signed within 45 days, the Letter of Intent becomes null and void. The Buyer could simply choose not to sign a Definitive Purchase Agreement, for any reason, and Seller is left with nothing.

5. It is clear from a review of the Letter of Intent that it is not a Definitive Purchase Agreement as required by the language of the February 14, 2004 Agreement. How can the Letter of Intent be an "offer under the language of the February 14, 2004 Agreement" when the Seller has absolutely no control over whether Buyer will proceed to the negotiations and signing of a Definitive Purchase Agreement. This is primarily so because Seller acquires no enforceability rights to require Buyer to proceed to a Definitive Purchase Agreement from the Letter of Intent.

6. The evidence will further reflect that upon receipt of the Lakeshore Media Letter of Intent that Plaintiff had it reviewed by its attorney, Michael Glaser. Mr. Glaser's opinion was that the Letter of Intent was vague. He testified he does not recommend to his clients to sign Letters of Intent. Mr. Glaser communicated with Ed Henson of Henson Media and requested that he have a Definitive Purchase Agreement prepared so Plaintiff could have it reviewed. The evidence will be clear that Plaintiff did not refuse to consider Lakeshore Media's inquiry, it merely asked that a Definitive Purchase Agreement be prepared as required by the

February 4, 2004 Agreement. In any event, Plaintiff was following legal advice in asking for the preparation of a Definitive Purchase Agreement. Neither Defendant nor Henson Media ever responded to this request nor did they ever produce a Definitive Purchase Agreement for Plaintiff to consider.

### Solicitation of Plaintiff by Defendant

The evidence will reflect that Defendant contacted Plaintiff, through Ed Henson, and solicited Plaintiff's interest in a proposed upgrade of KMOR. There were then direct communications between Plaintiff and Defendant concerning the details of the upgrade and a proposed contract. During the course of these discussions, Defendant's representatives advised Plaintiff's representative, Mike Tracy, that the KMOR radio station could be sold for $4.0 million to $6.0 million with $5.0 million being the likely price. Plaintiff relied upon these specific representations of Defendant in entering into the Agreement. Defendant will admit that these representations were made. Additionally, the evidence will reflect that Henson Media used $5.0 million as the initial listing price.

Later, in November, 2005, Defendant and Henson Media admitted that their prior representations as to selling price were too high and recommended the listing price be reduced to $4.0 million. Please note that the reduction of the listing price to $4.0 million came after the Lakeshore Media Letter of Intent.

### Negligent Misrepresentation

Under Kentucky law, the tort of negligent misrepresentation is defined as follows:

> One who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

6

*Presnell Construction Managers, Inc. v. EH Construction, LLC*, 13 S.W.3d 575, 580 (Ky. 2004) (quoting *Restatement (Second) of Torts* § 552 (1977)).  The evidence will show that Defendant made representations to Plaintiff as to the selling price in order to convince Plaintiff to enter into the Agreement.  These representations were later admitted by Defendant to be inaccurate.  Plaintiff reasonably relied on these representations in entering into the Agreement.  Without Defendant having made these representations, Plaintiff would not have entered into the Agreement.  The evidence will reflect that because of Plaintiff's debt and tax situation, anything under $4.0 million to $6.0 million was not workable.

### Greeley Broadcasting Co.

The February 14, 2004 Agreement provides that the term "sale" of KMOR "includes any sale, merger, lease, or any other adjustment of KMOR which accomplishes the transfer of actual or effective ownership or control of KMOR".  Defendant will claim that the creation of Tigre, LLC satisfies such definition and further that a separate series of agreements between Plaintiff and Greeley Broadcasting Co. came within such definition thus creating a breach of contract by Plaintiff.  Accordingly, the issue for the Court to decide is whether or not any of these arrangements accomplished "the transfer of actual or effective ownership or control of KMOR".

The formation of Tigre, LLC did not constitute a transfer of ownership or control of KMOR. The evidence will reflect that despite the statements by Lontine, Tigre, LLC was never funded by the members (Michael Tracy and Edward Salazar) and it never engaged in any business.  The fact that a limited liability company was formed but was never funded nor ever conducted business does not create any conceivable transfer of control.

Plaintiff did enter into Agreements with Greeley Broadcasting Co. Joint Sales Agreement (Exhibit "114"), Network Affiliation Agreement (Exhibit "113" and a separate Agreement

(Exhibit "112").  They were prepared by Plaintiff's FCC attorney, Scott Cinnamon.  Mr. Cinnamon testified in his deposition that the Agreements, in his opinion, did not constitute a transfer of control.  (These Agreements have now been terminated.  <u>See</u> Termination Agreement (Exhibit "224")).

Under the above Agreements, Plaintiff did not relinquish any control or ownership of KMOR to Greeley Broadcasting Co.   Plaintiff still owned and controlled KMOR during the short period of time the agreements were in place.

## II.

## FRAUD BY PLAINTIFF AND COUNTER-DEFENDANT

Count 2 of Defendant's second amended complaint alleges fraud on the part of both Plaintiff and Counter-Defendant "by concealing the sale, merger and/or disposition of the KMOR radio license to Tigre Broadcasting, all in an effort to deprive Spectrum Scan of its rightful share of the sale proceeds under the Agreement."

Under Kentucky law, a party making a fraud claim has the burden to prove each of the six elements of the *McGuffin* test:

> (1) that defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury.

*McGuffin v. Smith*, 286 S.W. 884, 886 (Ky. 1926).

With regard to Counter-Defendant, Defendant has alleged that "[t]hrough subterfuge, [Counter-Defendant] caused [Plaintiff] to assign its rights in KMOR to Tigre Broadcasting . . . ."  We would point out that the Counter-Defendant is wholly in control of the Plaintiff corporation.  He is the **majority shareholder, controlling director, and sole officer.**  In other words, Defendant

seeks to hold the Counter-Defendant liable for causing *himself*, as an officer/director of the Plaintiff, to commit the alleged fraud. We submit that this argument is contrary both to law and logic.

Defendant has prayed for punitive damages with respect to this Count 2. Section 411.184 of the *Kentucky Revised Statutes* provides, in pertinent part, that "[a] plaintiff shall recover punitive damages only upon proving, by clear and convincing evidence, that the defendant from whom such damages area sought acted toward the plaintiff with oppression, fraud, or malice." KEN. REV. STAT. § 411.184(2). The statute defines "oppression" as "conduct which is specifically intended by the defendant to subject the plaintiff to cruel and unjust hardship." *Id*. at § 411.184(1)(a). "'Fraud' means an intentional misrepresentation, deceit, or concealment of material fact known to the defendant and made with the intention of causing injury to the plaintiff." *Id*. at § 411.184(1)(b). Again, in order that the Defendant prove up its fraud claim, it must establish each element of the *McGuffin* test by clear and convincing evidence. *In re Sallee*, 286 F.3d 878, 896 (6th Cir, 2002). And clear and convincing evidence that the defendant acted towards the plaintiff with "fraud" allows the recovery of punitive damages in Kentucky. KEN. REV. STAT. § 411.184(2). However, assuming, *arguendo*, that the Defendant can establish this claim, it has not yet proven entitlement to punitive damages.

In order that punitive damages be allowed, the "fraud" must cause damages independent of those flowing from the wrongful act attempted to be concealed. *Hardaway Management Co. v. Southerland*, 977 S.W.2d 910, 917 (Ky. 1998). In other words, Spectrum must show that it has suffered damages in excess of those it can prove were caused by the Tigre LMA. *See id.* Moreover, there must be evidence that the information about the Tigre was concealed by TBC with the *intention of causing injury* to Spectrum. KEN. REV. STAT. § 411.184(1)(b); *Young v. Vista*

9

*Homes*, 243 S.W.3d 352, 367 (Ky.App. 2007).  There will be no evidence presented that Defendant suffered any excess damage or that Plaintiff or cross-defendant tried to conceal the Tigre situation for the purpose and intention of causing injury to Spectrum.

### III.

### TORTIOUS INTERFERENCE BY COUNTER-DEFENDANT

Count 3 of Defendant's complaint alleges that "[Counter-Defendant] has maliciously and intentionally interfered with the contractual relationship between [Plaintiff] and [Defendant] . . . ."  This claim can be disposed of by the simple proposition that a party to a contract cannot be held liable for tortiously inducing himself to breach the contract.  *See Rawlings v. Breit*, 2005 WL 1415356 (Ky. Ct.App. June 17, 2005) (citing *Rao v. Rao*, 718 F.2d 219 (C.A. Ill., 1983)).  In this case, Plaintiff acts only through the Counter-Defendant; the corporation could not form or breach contracts without his involvement and, in a very real sense, Counter-Defendant was a party to the disputed agreement in this case.  *See Rao*, 718 F.2d at 225.  Because Counter-Defendant is Plaintiff corporations majority shareholder, controlling director, and sole officer, he can not be considered to be a separate entity capable of inducing Plaintiff to breach its contracts.

### IV.

### FRAUDULENT CONVEYANCE BY PLAINTIFF

Section 378.010 of the *Kentucky Revised Statutes*, Kentucky's statute on fraudulent conveyances and encumbrances, invalidates any gift, conveyance, assignment, or transfer of either real or personal property that is made with an intention to defraud creditors, purchasers or other persons.  "In an action to set aside a conveyance for fraud, the general rule is that the fraud must be established by clear and convincing evidence."  *Russell County Feed Mill, Inc. v. Kimbler*,

520 S.W.2d 309 (Ky. 1975). It is the intent and purpose with which the debtor acts that makes a conveyance fraudulent, which must be determined by facts of each particular case. *Myers Dry Goods Co. v. Webb*, 181 S.W.2d 56 (Ky. 1944). As it is generally very difficult to prove fraud by direct evidence, such proof is not necessary. *Pergrem v. Smith*, 255 S.W.2d 42, 44 (Ky. 1953). "'Thus, the issue of fraud is commonly determined by certain recognized indicia, denominated 'badges of fraud,' which are circumstances so frequently attending fraudulent transfers that an inference of fraud arises from them.'" *United States v. Leggett*, 292 F.2d 423, 427 (6th Cir. 1961) (*citing Pergrem*, 255 S.W.2d at 44).

> These 'badges of fraud' are generally held to exist: (1) where the transfer or conveyance is between persons who are related or occupy a confidential relationship . . . ; (2) where the transfer or conveyance contains false statements and recitals as to consideration . . . ; (3) where the transfer or conveyance is made by a debtor in anticipation of a suit against him or after a suit has begun or is pending against him . . . ; and (4) where the transfer or conveyance is made by a debtor who transfers all or any appreciable part of his property when he is insolvent or financially embarrassed . . . .

*Kimbler*, 520 S.W.2d at 311, 312. Where badges of fraud are shown, it is a well-settled rule that the burden shifts to the transferee and he must rebut the inferences thereby created and sustain the bona fides of the transaction. *Pergrem*, 255 S.W.2d at 44. Otherwise stated,

> it would be unreasonable, in the absence of evidence to the contrary, to find that the transfer was not fraudulent, the rule to which the [Kentucky courts] have adhered is that the plaintiff is entitled to a directed verdict in the absence of countervailing proof tending to show that the transfer or conveyance was made fairly and without intent to defraud the creditor.

*Kimbler*, 520 S.W.2d at 311.

Defendant has prayed for punitive damages with respect to this claim. Again, the fraudulent conveyance must cause damages independent of those flowing from the wrongful act attempted to be concealed. *Hardaway Management Co. v. Southerland*, 977 S.W.2d 910, 917 (Ky. 1998). And Defendant must also show that the fraudulent conveyance was accomplished with the

intention of causing injury to it. KEN. REV. STAT. § 411.184(1)(b); *Young v. Vista Homes*, 243 S.W.3d 352, 367 (Ky.App. 2007). The evidence will show no conveyance or transfer of control of Plaintiff ever occurred in any business dealings with Greeley Broadcasting Co. It is also clear this cause of action should fail because all agreements between Plaintiff and Greeley Broadcasts have been terminated.

## V.

## AIDING AND ABETTING A FRAUDULENT CONVEYANCE BY COUNTER-DEFENDANT

In Count 5 of its complaint, Defendant alleges that Counter-Defendant is liable in tort for "facilitat[ing], aid[ing], and abett[ing] in the commission [of the fraudulent conveyance alleged in Count 4]." Again, Plaintiff corporation acted only through the Counter-Defendant. For the reasons set forth above, this allegation makes the extra-ordinary claim that the Counter-Defendant can be held liable for aiding and abetting *himself* in allegedly completing a fraudulent transfer. This assertion is contrary to law and logic.

## VI.

## IMPOSSIBILITY OF PERFORMANCE

In Count 6, the Defendant alleges that Plaintiff and/or Counter-Defendant is liable to Defendant for "impossibility of performance." We can find no Kentucky case law that would recognize or define this cause of action. We submit that the allegations in this Count 6 simply allege a breach of contract claim, and is therefore a redundant restatement of the allegations in Defendant's Count 1.

## VII.

## *QUANTUM MERUIT* / UNJUST ENRICHMENT

In Count 8, the Defendant alleges that it is entitled to relief in *Quantum Meruit*. In Count 9, the Defendant alleges that it is entitled to relief under the doctrine of unjust enrichment. Under Kentucky law, the two theories are the same:

> A claim for unjust enrichment is appropriate where there is insufficient evidence of the parties' agreement but nevertheless there is sufficient evidence that one party has conferred a benefit upon the other. In such circumstances, the plaintiff can assert there was a 'contract implied in law' which 'allows for recovery *quantum meruit* for another's unjust enrichment.

*Francis v. Nami Resources Company, LLC*, *slip copy*, 2008 WL 852047 *15 (E.D.Ky. March 28, 2008) (quoting *Perkins v. Daugherty*, 722 S.W.2d 907, 909 (Ky.App. 1987)). In other words, recovery in *quantum meruit* and recovery under the theory of unjust enrichment are indistinguishable under Kentucky law.

Relief in *quantum meruit* "is not based upon a contract, but a legal fiction invented to permit recovery where the law of natural fiction says there should be a recovery as if promises were made." *Perkins*, 722 S.W.2d at 909. However, "the doctrine of unjust enrichment has no application in a situation where there has been an explicit contract which has been performed." *Res-Care, Inc. v. Omega Healthcare Investors, Inc.*, 187 F.Supp.2d 714 (W.D.Ky. 1995). Here, Plaintiff and/or Counter-Defendant has alleged that it has not failed to perform any of its obligations under the Agreement in this case. In such a case, relief in *quantum meruit* is not available. *HGB Marketing, Inc. v. Pomeroy Computer Resources, Inc.*, 145 Fed.Appx. 982, 987-88 (6th Cir. 2005)(applying Kentucky law).

Assuming that the Court determines that there was no explicit agreement in this case, and further determines that the facts lead to the conclusion that a contract should be implied in law, in order to recover in *quantum meruit*, Defendant must establish the following elements: (1) that valuable services were rendered, or materials furnished, (2) to the person from whom

13

recovery is sought, (3) which services were accepted by that person, or at least were received by that person, or were rendered with the knowledge and consent of that person, and (4) under such circumstances as reasonably notified the person that the plaintiff was expected to be paid by that person. *Quadrille Business Systems v. Kentucky Cattlemen's Association, Inc.*, 242 S.W.3d 359 (Ky.App. 2007)(citing 66 Am.Jur.2d *Restitution and Implied Contracts* § 38 (2001)).

A professional person rendering services to another is entitled to recover only a reasonable fee--as opposed to expectation damages--if recovery of that fee is grounded in *quantum meruit*. *See Manning v. Owens*, 125 S.W.2d 753 (1939). Therefore, it is Plaintiff's position that Defendant's alleges services under a theory of *quantum meruit* are not simply equal to 40% of the $3.5 million Letter of Intent as Defendant will argue. Defendant would only be entitled to receive the reasonable value of the services. This is a much different damages standard than the contract damages sought by Defendant.

## CONCLUSION

Plaintiff and Cross-Defendant hereby submit this Pre-Trial Brief to the Court.

<br>

TRACY BROADCASTING CORPORATION,
Plaintiff, and MICHAEL TRACY,
Cross-Defendant,

s/ Paul E. Hofmeister
By_____
   Paul E. Hofmeister, NSBA #15557
   Maren Lynn Chaloupka, NSBA #20864

Chaloupka, Holyoke, Hofmeister, Snyder
   & Chaloupka, PC, LLO
1714 Second Avenue; PO Box 2424
Scottsbluff, NE 69363-2424
Telephone: (308) 635-5000

CERTIFICATE OF SERVICE

      I hereby certify that on May 30, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF System which gave electronic notice to the following attorneys:

      Paul J. Hershberg
      Glenn A. Cohen
      Meidinger Tower, 22nd Floor
      462 S. Fourth Street
      Louisville, KY 40202

                                      s/ Paul E. Hofmeister
                                      Paul E. Hofmeister, NSBA #15557