IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| TRACY BROADCASTING CORP., ) | |
| ) | |
| Plaintiff, ) | 8:06CV336 |
| ) | |
| vs. ) | ORDER |
| ) | |
| SPECTRUM SCAN, LLC, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| vs. ) | |
| ) | |
| MICHAEL TRACY, ) | |
| ) | |
| Counter-Defendant. ) | |

    This is an action to determine the parties' rights and responsibilities related to an agreement involving the projected sale of a radio station license. The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000. Pursuant to 28 U.S.C. § 636 and the consent of the parties,[1] the matter was tried to the undersigned magistrate judge August 11-13, 2008. The parties submitted closing arguments in writing, whereupon the case was deemed submitted for decision.

## BACKGROUND

    The plaintiff Tracy Broadcasting Corporation (TBC) owned a number of radio station licenses in 2004. **See** Filing No. 122 - Pretrial Order (PTO) ¶ B. Michael Tracy is the majority owner of TBC. *Id.* The defendant Spectrum Scan, LLC (Spectrum Scan) is a Kentucky limited liability company doing business in the field of radio communications. *Id.* Spectrum Scan's principals have experience in navigating the complex technical and regulatory system implemented by the Federal Communications Commission (FCC), which

---

[1]On August 2, 2006, United States Senior District Judge Lyle E. Strom transferred this matter to the undersigned magistrate judge. **See** Filing No. 13.

licenses radio station bandwidth. *Id.* In its business, Spectrum Scan identifies radio station properties that might benefit from modifying their signals – either by upgrading or downgrading them – so that station licenses may be relocated to more populated locations with greater listener bases. *Id.*

In 2004, Spectrum Scan approached TBC about the possibility of performing engineering and regulatory work that would enable TBC to relocate one of its station licenses, KMOR-FM, from Scottsbluff, Nebraska to Fort Collins, Colorado, a larger market. *Id.* Spectrum Scan also offered to modify and upgrade the signal of one of TBC's other radio stations, KOZY. *Id.* Spectrum Scan proposed a contract under which it would provide expertise in securing the regulatory approval from the FCC to move KMOR, in exchange for which TBC would cooperate in marketing the station after the move, and would sell the station to the highest offeror according to the provisions in the contract. *Id.* Spectrum Scan would be paid forty percent (40%) of the eventual sale price. *Id.* The parties entered into this contract on February 14, 2004. *Id.* By June, 2004, the FCC approved Spectrum Scan's request to move KMOR's license from Scottsbluff to Fort Collins and approved the request to upgrade the KOZY license in Scottfbluff. *Id.*

On February 17, 2006, TBC filed the instant action in the District Court of Scottsbluff County, Nebraska. **See** [Filing No. 1](). TBC seeks declaratory judgment regarding the agreement between the parties and alleges breach of contract and misrepresentation. **See Id.** Ex. A - Complaint ¶¶ A-D. Spectrum Scan filed counter-claims against TBC and claims against Mr. Tracy. **See** [Filing No. 38](). Spectrum Scan's Second Amended Counter-Claim and Cross-Claim alleges nine theories of liability against Mr. Tracy, TBC, or both. Specifically, Spectrum Scan avers breach of contract by TBC (Count 1), fraud by Tracy (Count 2), tortious interference by Mr. Tracy (Count 3), fraudulent conveyance by TBC (Count 4), aiding and abetting in a fraudulent conveyance by Mr. Tracy (Count 5), impossibility of performance (Count 6), abuse of process by TBC (Count 7), and quantum meruit and unjust enrichment against TBC (Counts 8 and 9). *Id.* These claims are based on Spectrum Scan's allegations that Mr. Tracy, with TBC, attempted to defraud Spectrum Scan by transferring an interest in KMOR to Tigre Broadcasting, an entity primarily owned by Mr. Tracy. *Id.* Further, Spectrum Scan alleges Mr. Tracy concealed the transfer so as

to avoid selling KMOR and paying Spectrum Scan's fee. *Id.* Spectrum Scan seeks punitive damages in connection with the claims against TBC and Mr. Tracy.

On May 11, 2007, TBC and Mr. Tracy filed a motion to dismiss and remand. **See** Filing No. 43. TBC and Mr. Tracy argued the joining of Mr. Tracy as a party destroyed diversity jurisdiction. On June 22, 2007, the court denied the motion and determined diversity jurisdiction exists. **See** Filing No. 53.[2] On October 1, 2007, TBC and Mr. Tracy filed a motion for partial summary judgment on Spectrum Scan's claims by arguing the February 14, 2004 agreement was unenforceable as written. **See** Filing No. 64. On January 11, 2008, TBC and Mr. Tracy filed a motion for judgment on the pleadings seeking dismissal of Spectrum Scan's claim for punitive damages. **See** Filing No. 81. On February 11, 2008, the court denied both motions. **See** Filing No. 96. The issues remaining for trial are:

1. Whether the agreement is unenforceable because it is vague and ambiguous.
2. Whether Spectrum Scan breached the agreement.
3. Whether Spectrum Scan negligently or recklessly made inaccurate representations to TBC, prior to the execution of the agreement, about the amount for which KMOR would sell.
4. Whether TBC is entitled to set-off any judgment.
5. Whether TBC breached the agreement.
6. Whether Mr. Tracy is personally liable to Spectrum Scan.
7. Whether TBC and/or Mr. Tracy were unjustly enriched by the value of the services provided by Spectrum Scan.
8. Spectrum Scan's damages, including interest, if any.

**See** Filing No. 122 - PTO p. 2-7.[3]

Before trial, TBC and Mr. Tracy filed a trial brief (Filing No. 124) and proposed findings of fact and conclusions of law (Filing No. 123). Spectrum Scan filed a trial brief (Filing No. 125) and proposed findings of fact and conclusions of law (Filing No. 126). At

---

[2]TBC and Mr. Tracy continue to dispute jurisdiction (Filing No. 122 - PTO p. 6), however the court finds no legal reason to alter the earlier decision.

[3]Spectrum Scan abandons the claims against Mr. Tracy for tortious interference and aiding and abetting in a fraudulent conveyance (Count 3 and 5) based on Mr. Tracy being the sole shareholder of TBC. **See** Filing No. 149 - Brief p. 51. However, Spectrum Scan maintains that Mr. Tracy is personally liable for damages. *Id.*

the conclusion of TBC's case-in-chief, the defendant made an oral motion for judgment as a matter of law, which the court took under advisement.  **See** Filing No. 138 (court minutes); Trial Transcript (TR.) 525-552.  The parties filed post-trial briefs after the trial transcript was completed.  **See** Filing Nos. 142, 146 and 147 - TR.  TBC and Mr. Tracy filed a brief (Filing No. 148) and a reply brief (Filing No. 150).  Spectrum Scan filed a response brief (Filing No. 149).  At the conclusion of briefing, the matter was deemed submitted.

### FINDINGS OF FACT

Based on the evidence presented and pursuant to Fed. R. Civ. P. 52(a)(1), the court makes the following findings of fact:

TBC owned a number of radio station licenses in 2004.  **See** Filing No. 122 - PTO ¶ B.  Michael Tracy is the sole owner and president of TBC.  *Id.*; TR. 33.  The defendant Spectrum Scan, LLC (Spectrum Scan) is a Kentucky limited liability company doing business in the field of radio communications.  **See** Filing No. 122 - PTO ¶ B.  Rodney Burbridge is the president of Spectrum Scan.  **See** TR. 379.  In 1997, Rodney Burbridge formed Rodco, Inc., which was one-half owner of Spectrum Scan.  **See** TR. 378.  However Rodco, Inc. was administratively dissolved by the State of Kentucky on November 3, 1998. **See** TR. 378-379.

In 2004, Spectrum Scan, through Henson Media, Inc., approached TBC about the possibility of Spectrum Scan performing engineering and regulatory work which would enable TBC to relocate one of its station licenses, KMOR-FM, from Scottsbluff, Nebraska to Fort Collins, Colorado, a larger market.  **See** Filing No. 122 - PTO ¶ B; TR. 36. Spectrum Scan also offered to modify and upgrade the signal of one of TBC's other radio stations, KOZY.  *Id.*  Mr. Tracy spoke to Clarance Edward Henson from Henson Media, Inc. and Rodney Burbridge on the telephone about the proposed project.  **See** Ex. 235 at p. 9; TR. 38.  During this conference call the prospective value of KMOR was discussed. Specifically, "they told [Mr. Tracy] . . . the station could be worth, you know, four, five, six million dollars" after relocation.  **See** TR. 39-40, 43, 395-396.  Rodney Burbridge told Mr. Tracy that he had a couple of "very interested parties" and it should be a "quick turn."  **See** TR. 40, 197.  Spectrum Scan did not tell TBC the values discussed were estimates or

speculative in nature. **See** TR. 396. Similarly, Rodney Burbridge did not promise or assure Mr. Tracy KMOR would sell for $5 million. **See** TR. 181. Rodney Burbridge explained the projected value was based on his experience and information that two other radio license sales in the area averaged $4 million a piece. **See** TR. 390, 395. Further, Rodney Burbridge explained by "quick turn" he meant he thought the license would sell quickly relative to the FCC approval, but would still take two to three years overall. **See** TR. 397. Rodney Burbridge believed his projections were "accurate at the time based on what was happening in the marketplace." **See** TR. 439, 499. Shortly after the telephone conference, Mr. Tracy signed an agreement for the project on behalf of TBC, as its president. **See** Ex. 4 at p. 6. Similarly, Rodney Burbridge signed on behalf of Spectrum Scan "By Rodco, Inc., Member By Rodney Burbridge, President." *Id.*

The Agreement, dated February 14, 2004, is an agreement between TBC and Spectrum Scan for the downgrade, relocation, marketing and sale of KMOR, by Spectrum Scan. **See** Ex. 4. Additionally, the Agreement covers the upgrade of KOZY. *Id.* In exchange for the engineering and regulatory work, TBC agreed to sell KMOR to the "highest offeror" and to pay Spectrum Scan 40% of the sale price. **See** *id.* ¶ 3. The Agreement does not include a definition of "highest offeror," set a time period for performance of the Agreement, or provide for a minimum sales price. **See** *id.* The agreement states, in relevant part:

> If the changes proposed in the Upgrade Request are adopted by the FCC in a final order ("the FCC RuleMaking Approval"), then Spectrum Scan and the Owner will market KMOR for sale, and the Owner will sell KMOR to the highest offeror. Any purchase of KMOR would be made pursuant to the terms and conditions of a definitive purchase agreement . . . which would be in form and substance reasonably satisfactory to the Owner and the purchaser. . . . As used in this Agreement, the term "sale" of KMOR includes any sale, merger, lease or any other adjustment of KMOR which accomplishes the transfer of actual or effective ownership or control of KMOR.

*Id.* ¶ 3(a).

The Agreement specifically provides that TBC, the Owner, "may retain Henson Media as a broker to assist it in finding a purchaser for KMOR as described in Section 3.a.

above, and Henson Media's fee shall be paid by Spectrum Scan." *Id.* ¶ 4(c). Additionally, the parties chose Kentucky law to apply to their contract, stating "[t]his Agreement shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Kentucky." *Id.* ¶ 10(a).

Spectrum Scan secured the FM allotment changes discussed in the Agreement, and in June 2004, the FCC approved Spectrum Scan's request to move KMOR's license. **See** Filing No. 122 - PTO ¶ B. Spectrum Scan incurred out-of-pocket expenses totaling $30,760.00 for engineering and legal work associated with the project. **See** Ex. 196 and 197; TR. 402-406.

Beginning in June 2004, Henson Media, Inc. actively marketed KMOR for sale on behalf of Spectrum Scan and TBC. **See** Ex. 90; Ex. 235 - Henson depo. p. 109, 111. The initial asking price was to be $5 million. **See** Ex. 235 - Henson depo. p. 57. In July 2004, Mr. Tracy received a telephone call from Vic Michael, president of Laramie Mountain Broadcasting, who was interested in purchasing the KMOR construction permit. **See** TR. 64-65; Ex. 12. Mr. Michael stated his opening and closing offer would be $1.2 million. **See** Ex. 13. The parties agreed this initial price was inadequate.

In October 2004, Mr. Henson told Mr. Tracy the asking price of $5 million appeared too high considering the market and Mr. Henson's conversations with interested parties. **See** Ex. 138; TR. 70-71. After discussions with Mr. Tracy, Mr. Henson was authorized to offer KMOR at $4 million. **See** Ex. 235 - Henson depo. p. 53-54, 57-58.

On February 8, 2005, Vic Michael from Laramie Mountain Broadcasting, sent an unsigned Letter of Intent to Mr. Tracy offering to purchase KMOR for $3.1 million. **See** TR. 74; Ex. 22, 23. The proposal stated it expired, if unaccepted, on February 11, 2005. **See** Ex. 22. TBC did not accept.

On February 23, 2005, Marathon Media made an offer for KMOR for $3.5 million. **See** TR. 78, 80-81; Ex. 30. The offer included a separate $1.8 million for TBC's other five radio stations. **See** Ex. 30. Mr. Tracy inquired about making the sale for the five stations separately, so he might sell KMOR to Vic Michael. **See** Ex. 29, 30, 31. Mr. Tracy also stated he needed an additional $300,000 for the real estate, due to his tax liability. **See** Ex. 32. At that time, Mr. Tracy expressed his frustration that the deal was not going to be

for what he initially was told for KMOR alone.  *Id.*  However, on March 3, 2005, TBC made a counteroffer for $5.6 million for all six stations, specifying the price was $3.5 million for KMOR and $2.1 million for the other five stations.  **See** Ex. 35.  On March 14, 2005, Henson Media, Inc. sent a Letter of Intent memorializing the counteroffer to College Creek Broadcasting, which is the same organization as Marathon Media.  *Id.*; Ex. 37; TR. 87.  After receipt of the March 14, 2005 Letter of Intent, Mr. Tracy asked Mr. Henson about his commission schedule and the inclusion of certain property.  **See** Ex. 37, 38.  Additionally, Mr. Tracy mentioned Marathon Media should either come in with a purchase agreement immediately or a higher offer, above the counteroffer.  **See** Ex. 39.  College Creek Broadcasting did not accept the counteroffer.  **See** TR. 87.

On March 31, 2005, Mr. Henson wrote to Mr. Tracy indicating they were still waiting for a response from College Creek Broadcasting/Marathon Media and another potential buyer.  **See** Ex. 40.  Mr. Henson specified he told the potential buyer they would take the first solid offer at $5.6 million.  *Id.*  On May 7, 2005, Mr. Henson asked Mr. Tracy about an offer for $3.5 million, with a $3.1 million cash down payment and a note for the remainder.  **See** Ex. 44.  Mr. Tracy inquired about the structure of the deal, but did not comment on the price.  *Id.*  On May 17, 2005, Vic Michael stated he was not interested in buying KMOR for $3.25 million and opined it was worth about $2.5 million unbuilt.  **See** Ex. 45.

On August 12, 2005, Mr. Henson met with representatives from Marathon Media (d/b/a Lakeshore Media).  **See** Ex. 58, 57, 58.  Prior to the meeting, Mr. Henson spoke to Mr. Tracy about his instructions.

> I remember Michael [Tracy] telling me specifically, he said I want you to do one of three things when you go meet with Marathon.  He said I want something in writing.  I will take three five cash; I will take 3.1 million with the CP [construction permit] from the Mitchell Station, which is a CP, that College Creek Marathon had in the Nebraska area where Michael was.  So three five cash, three one with the CP, or whatever other deal I could get with them.  And I walked out of that meeting with a three five cash offer and called Michael.

**See** Ex. 235 - Henson Depo. p. 51; **see also** *id.* p. 81-82; TR. 267.

Mr. Tracy told Mr. Henson $3.5 million in cash was the preferable deal for KMOR. **See** Ex. 235 - Henson Depo. p. 81. On August 12, 2005, Bruce Buzil signed a Letter of Intent for KMOR for a total purchase price of $3.5 million. **See** Ex. 58. The Letter of Intent included a period of forty-five days for Lakeshore Media to inspect records and TBC to cease entertaining offers on KMOR. *Id.* The Letter of Intent was set to expire on August 19, 2005, if not signed by TBC. *Id.*

Mr. Tracy asked that the Letter of Intent be sent to his attorney Michael Glaser, which it was on August 15, 2005. **See** Ex. 60. Mr. Tracy did not sign the Letter of Intent, but stated he has some problems with it, including taking KMOR off of the market. Mr. Tracy told Mr. Henson he wanted to proceed straight to an asset purchase agreement. **See** Ex. 235 - Henson Depo. p. 84-85. On August 19, 2005, Mr. Henson advised Mr. Tracy to cross out paragraph 7, regarding exclusive dealing, of the Letter of Intent and sign it. **See** Ex. 66. Later that day, Mr. Henson sent an email to Mr. Buzil explaining they needed additional time, to which Mr. Buzil responded, "I look forward to talking to you soon." **See** Ex. 68.

Meanwhile, on August 17, 2005, Mr. Tracy engaged another broker, Chuck Lontine, to transact sales of TBC's broadcast properties including KMOR. **See** Ex. 62. Mr. Tracy and Mr. Lontine were trying to figure out what Marathon was "up to" in acquiring KMOR and determine whether they could make more money by refusing the sale to Marathon. **See** Ex. 72; Ex. 236 - Lontine Depo. p. 130-132, 234; TR. 286-293. Mr. Lontine put Mr. Tracy in contact with Ricardo Salazar as early as July 2005. **See** TR. 137, 327. Mr. Tracy worked with Mr. Lontine, rather than Mr. Henson, to market KMOR after November 2005. **See** TR. 133. In early 2006, Mr. Tracy entered into a business relationship with Mr. Salazar utilizing KMOR as a radio station in conjunction with Greeley Broadcasting Corporation. **See** TR. 137-142; Ex. 98.

TBC began construction or improvements for KMOR in November 2005. **See** TR. 56. Construction was completed in January or February 2007. **See** TR. 57. The construction cost TBC approximately $380,000. **See** TR. 59; Ex. 213.

On November 14, 2005, Mr. Tracy sent a letter to Rodney Burbridge expressing TBC's frustration about having no results from the marketing of KMOR. **See** Ex. 89. Mr.

Tracy questioned whether the asking price was still between four and five million dollars. *Id.* Henson Media, Inc. responded by outlining the marketing efforts and stating the asking price was still $4 million, however the price should be $3.5 million. **See** Ex. 90. Spectrum Scan also responded to Mr. Tracy's letter. **See** Ex. 91. Both Mr. Henson and Rodney Burbridge thought the August 12, 2005 Letter of Intent was a valid offer, which Mr. Tracy countermined by failing to respond and/or requesting a purchase agreement. **See** Ex. 91; Ex. 235 - Henson Depo. p. 83-84.

On February 1, 2006, Mr. Henson and Mr. Tracy spoke by telephone about the direction marketing KMOR should take. **See** TR. 134-135; Ex. 235 - Henson Depo. p. 109. Mr. Tracy stated he would not offer KMOR for sale at a price any less than $5 million. **See** TR. 134-135; Ex. 235 - Henson Depo. p. 42. Mr. Tracy did not tell Mr. Henson to cease efforts at marketing KMOR. **See** TR. 135. However, Mr. Henson asked Mr. Tracy if Mr. Henson should continue to work on this project and Mr. Tracy initially responded by saying "I don't know, let me think about it." **See** Ex. 235 - Henson Depo. p. 39-41. Two weeks later, TBC filed an agreement to move KMOR's tower site. *Id.* p. 41. This conduct indicated to Mr. Henson that TBC was working with other parties without the knowledge of Spectrum Scan. *Id.* Mr. Henson never heard back from Mr. Tracy regarding marketing KMOR. *Id.* p. 42-43.

## CONCLUSIONS OF LAW

**A.     Ambiguity**

Kentucky contract law governs this diversity action. **See** Ex. 4 - Feb. 14, 2004 Agreement ¶ 10; **see also** *JN Exploration & Prod. v. W. Gas Res., Inc.*, 153 F.3d 906, 909 (8th Cir. 1998) (stating "it is axiomatic that federal courts apply state substantive law in diversity suits") (**citing** *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). When a federal district court exercises its diversity jurisdiction over claims brought under state law causes of action, it is bound by the state's law as determined by the highest court in that state. *Foy v. Klapmeier*, 992 F.2d 774, 780 (8th Cir. 1993). "If there be no decision by that court then federal authorities must apply what they find to be the state law after giving 'proper regard' to relevant rulings of other courts of the State." *Comm'r v. Estate of*

*Bosch*, 387 U.S. 456, 465 (1967); **see also** *First Colony Life Ins. Co. v. Berube*, 130 F.3d 827, 829 (8th Cir. 1998) (stating a federal court exercising diversity jurisdiction "must predict how the state's highest court would decide the issue").

TBC and Mr. Tracy argue the Agreement entered into by TBC and Spectrum Scan is so indefinite and uncertain as to the promises and performances of the parties that the Agreement is not enforceable as a matter of law. Specifically, TBC and Mr. Tracy argue the Agreement fails to define "highest offeror," set forth the duration of the Agreement, or include a sales price for KMOR. **See** Filing No. 148 - Brief p. 45. TBC and Mr. Tracy contend that, without more specificity with regard to these terms, the agreement is fatally ambiguous leaving too many material questions unanswered. TBC and Mr. Tracy explain a reasonable duration for performance under the Agreement may be the duration of the construction permit, which is three years. If so, the Agreement would expire in March 2008, three years after the issuance of the permit. Accordingly, TBC and Mr. Tracy conclude the highest offeror could not be ascertained until the expiration of the three-year term of the Agreement, in relation to the other offers received during the given time period. Along these lines, TBC and Mr. Tracy contend the court is required to infer two reasonable time periods. First, a reasonable time period to receive offers. Second, a reasonable time period to complete performance under the Agreement by determining which offer was the highest. In addition, the TBC and Mr. Tracy argue the court must infer a reasonable minimum price which would require acceptance. TBC and Mr. Tracy assert such reasonable price in this matter is between $4 and $6 million.

"In Kentucky, [the proponent of a contract] must show that an actual agreement existed between the parties with clear and convincing evidence. While the agreement need not cover every conceivable term of the relationship, it must set forth the 'essential terms' of the deal." *Quadrille Bus. Sys. v. Kentucky Cattlemen's Assoc., Inc.*, 242 S.W.3d 359, 364 (Ky. Ct. App. 2007) (**quoting** *Auto Channel Inc. v. Speedvision Network LLC*, 144 F. Supp. 2d 784, 790 (W.D. Ky. 2001) (**citing** *Industrial Equip. Co. v. Emerson Elec. Co.*, 554 F.2d 276, 288 (6th Cir. 1977)); **see also** 17A Am. Jur. 2d Contracts § 190. "[T]o be enforceable either in law or equity, a contract must be fairly definite and certain; that the promises and performances to be rendered by each party are

reasonably certain." *Fisher v. Long*, 172 S.W.2d 545, 547 (Ky. 1943); **see** *Langley v. Prudential Mortg. Capital Co., LLC*, 546 F.3d 365, 368 (6th Cir. 2008); *Kovacs v. Freeman*, 957 S.W.2d 251, 254 (Ky. 1997). "In reaching a determination as to definiteness and intention of the parties, the whole contract must be considered and be given practical interpretation." *Fisher*, 172 S.W.2d at 547.

Applying the standards cited above, the court concludes the contract was plain enough in its terms that each party should have had no difficulty in understanding what was intended. Although the contract does not define the term "highest offeror," the term does not suffer from impenetrable vagueness and uncertainty. The term is not itself susceptible to more than one meaning. TBC and Mr. Tracy contend confusion is caused by the lack of a definite time period controlling the Agreement. However, "where no time for performance has been set, it will be presumed that performance is to begin within a reasonable time." *Koplin v. Faulkner*, 293 S.W.2d 467, 470 (Ky. 1956); **see** *Walker v. Keith*, 382 S.W.2d 198, 202 (Ky. 1964) ("It is true courts often must *imply* such terms in a contract as 'reasonable time' or 'reasonable price.'"); **see also** 17B C.J.S. *Contracts* § 716 (2007).

Here, the duration of the contract was dependant on when Spectrum Scan obtained FCC approval. Thereafter, the parties contemplated they would market and secure a buyer for KMOR within a reasonable period of time. The court may imply the term "reasonable period of time" and no definitive time period must be assumed. Similarly, the court will not render the Agreement unenforceable by its failure to define highest offeror or to include a purchase price for KMOR. The term highest offeror is not ambiguous and the requirement for a reasonable price for the sale of KMOR is inferred. There is no evidence before the court suggesting the parties were actually confused about the duration of the contract or what was intended. For these reasons, the assumed practical problems, raised by TBC and Mr. Tracy, about knowing when the parties have found the highest offeror are inconsequential. Further, the terms of the contract are plain. For these reasons it is clear there was substantial certainty as to the material terms upon which the minds of the parties met.

**B.     Misrepresentation**

TBC alleges Spectrum Scan negligently misrepresented the sales price of KMOR to TBC in order to induce TBC to enter into the Agreement, when Spectrum Scan knew, or should have known, at the time the representations were made that KMOR could not sell for the stated sales price.  **See** Filing No. 148 - Brief p. 48-50.  TBC contends it reasonably relied on Spectrum Scan's representations that KMOR would sell for between $4 and $6 million, but likely for $5 million.  *Id.*  Spectrum Scan did not tell TBC the stated values were estimates or speculative in nature.  **See** TR. 396.  Similarly, Rodney Burbridge did not promise or assure Mr. Tracy KMOR would sell for $5 million.  **See** TR. 181.

Kentucky adopted Restatement (Second) of Torts § 552, which outlines the elements of negligent misrepresentation as follows:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Presnell Const. Managers, Inc. v. EH Const., LLC*, 134 S.W.3d 575, 580, 582 (Ky. 2004) (**quoting** Restatement (Second) of Torts § 552); **see also** *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999) (elements of fraud).

"Under Kentucky law, representations as to future conduct will not support a fraud claim.  However, a statement as to future conduct may form the basis for a misrepresentation claim if made with the intent to induce the other party to enter into a contract."  *Davis v. Siemens Med. Solutions USA, Inc.*, 399 F. Supp. 2d 785, 800 (W.D. Ky. 2005) (**citing** *Schroerlucke v. Hall*, 249 S.W.2d 130, 131 (Ky. 1952) (other internal citations omitted)).  Moreover, "opinion and sales puffery . . . will not support a fraud claim." *U.S. Achievement Acad., LLC v. Pitney-Bowes, Inc.*, 458 F. Supp. 2d 389, 397 (E.D. Ky. 2006).  Likewise, "an expression of an opinion as to future profits is not actionable as fraud, at least where the subject of the opinion is not susceptible of definite knowledge." *Radioshack Corp. v. ComSmart, Inc.*, 222 S.W.3d 256, 262 (Ky. Ct. App. 2008) (**citing** *Moseley v. Owensboro Mun. Hous. Comm'n*, 252 S.W.2d 880, 881 (Ky. 1952)).

TBC fails to sustain its burden of proving negligent misrepresentation. TBC failed to show the representations made by Rodney Burbridge were false when made. Additionally, the uncontroverted facts show Rodney Burbridge reasonably believed the information was true, based on market conditions at the time he made the representations to TBC. Finally, it is doubtful the representations made by Rodney Burbridge are actionable as negligent misrepresentations under Kentucky law, in any event, because the representations were based on Rodney Burbridge's opinion regarding future values which were not susceptible to definite knowledge. This is particularly true where the value was given in a range spanning $2 million. Accordingly, TBC's claim for negligent misrepresentation must fail.

### C.    Rodco, Inc.

In closing argument, TBC argues the Agreement is invalid because it was not properly executed by Spectrum Scan. Specifically, TBC contends the Agreement was signed by Rodney Burbridge on behalf of Rodco, Inc., a dissolved corporation, who had no authority to conduct business. Although TBC raised this issue to some extent in a motion in limine prior to the pretrial conference, no party sought to include the issue in the Pretrial Order at the time of the pretrial conference, during trial or subsequently.

"The [P]retrial [O]rder measures the dimensions of a lawsuit. In general, the [P]retrial [O]rder should be construed liberally to cover any theory of recovery that might be embraced within the order's language. . . . [A] party may be barred from advancing theories that are not identified in the [P]retrial [O]rder." *United States v. $84,615 in U.S. Currency*, 379 F.3d 496, 499 (8th Cir. 2004) (alternations in original) (quotations omitted). Since the invalidity of the Agreement based on the signator is a new theory which is not contained in the Pretrial Order, the court declines to address the merits of the issue.

### D.    Breach

TBC seeks relief for breach of contract from Spectrum Scan on two bases. First, TBC contends Spectrum Scan breached the Agreement by retaining Henson Media, Inc. to broker a sale of KMOR. TBC argues Spectrum Scan's retention of Henson Media, Inc. usurped the plaintiff's ability and discretion to do so. **See** Filing No. 148 - Brief p. 47-48.

Second, TBC argues Spectrum Scan failed to take reasonable steps or action under the terms of the Agreement to market KMOR for sale.  *Id.*  TBC contends the breach occurred because Spectrum Scan (and Henson Media, Inc.) ceased all efforts to market KMOR for sale sometime in February, 2006, without waiting for a sale of the station.  *Id.*  In turn, Spectrum Scan argues TBC breached the Agreement by failing to sell KMOR to the highest offeror.  **See** Filing No. 149 - Brief p. 32.  Further, Spectrum Scan contends Mr. Tracy's actions rendered performance by Spectrum Scan under the Agreement impossible.  *Id.* p. 47.

### 1. Henson Media, Inc.

The Agreement specifically named Henson Media, Inc. as a broker who may be retained to assist in the marketing of the KMOR license and construction permit upon FCC approval.  **See** Ex. 4 ¶ 4(c).  Further, the Agreement specified Spectrum Scan was to pay Henson Media, Inc.'s brokerage fee out of its share of any eventual sale price.  *Id.*  TBC was aware of the designation of Henson Media, Inc. as broker in the contract.  **See** TR. 44-45.  TBC did not object to Henson Media, Inc.'s inclusion in the Agreement, nor did it suggest removal or replacement with an alternate choice.  **See** Ex. 1, 2, 3 and 4.  Once the marketing of the station commenced, TBC recognized Mr. Henson as the broker on the deal, referring prospects to him and communicating with him regarding offers, responses and counter offers.  **See** TR. 61-62, 65, 72, 251; Ex. 235 - Henson depo. p. 38-39.  TBC did not have a separate written agreement with Henson Media, Inc.  **See** TR. 251; Ex. 235 - Henson depo. p. 39.  TBC did not contract with any other brokers for the sale of KMOR during the first year.  **See** TR. 61.  However, TBC did enter into a written brokerage agreement with Mr. Lontine in August 2005.  **See** Ex. 62.

Spectrum Scan contends TBC ratified the use of Henson Media, Inc. by acquiescence.  Such acceptance of Henson Media, Inc., according to Spectrum Scan, would foreclose TBC's argument regarding breach of this contractual term and may serve to modify the technical requirements of a contract in that respect.  **See generally** *City of Whitesburg v. Whitesburg Water Co.*, 78 S.W.2d 330, 334 (Ky. 1935).  Spectrum Scan argues TBC's acceptance and recognition of Henson Media, Inc. as the broker marketing

KMOR effectively waived any requirement for a written brokerage agreement between TBC and Henson Media, Inc.

Neither the Agreement, nor Spectrum Scan required TBC to use Henson Media, Inc. Further, Spectrum Scan did not usurp TBC's discretion to either use a different broker or refuse to work with Henson Media, Inc. Under the terms of the Agreement, Henson Media, Inc. was listed as an option for use by TBC and whose fee would be paid by Spectrum Scan. Under the factual circumstances here, TBC did initially rely on Henson Media, Inc. to market and broker any sale of KMOR. Later, TBC, at its own discretion, determined it did not want to work with Henson Media, Inc. Spectrum Scan's conduct of relying on Henson Media, Inc. to market and broker potential sales of KMOR did not constitute a breach of the Agreement.

### 2. Highest Offeror

The Agreement placed the burden on both Spectrum Scan and TBC to market KMOR for sale. **See** Ex. 4 ¶ 3(a). The evidence shows Henson Media, Inc. actively marketed KMOR for sale on behalf of Spectrum Scan and TBC from June 2004 until February 2006. **See** TR. 134-135; Ex. 90; Ex. 235 - Henson depo. p. 109, 111. On February 1, 2006, Mr. Henson and Mr. Tracy spoke by telephone about the direction marketing KMOR should take. **See** TR. 134-135; Ex. 235 - Henson Depo. p. 109. Mr. Tracy stated he would not offer KMOR for sale at a price any less than $5 million. **See** TR. 134-135; Ex. 235 - Henson Depo. p. 42. Mr. Tracy did not tell Mr. Henson to cease efforts at marketing KMOR. **See** TR. 135. However, Mr. Henson asked Mr. Tracy if Mr. Henson should continue to work on this project and Mr. Tracy initially responded by saying "I don't know, let me think about it." **See** Ex. 235 - Henson Depo. p. 39-41. Two weeks later, TBC filed an agreement to move KMOR's tower site. *Id.* p. 41. This conduct indicated to Mr. Henson that TBC was working with other parties without the knowledge of Spectrum Scan. *Id.* Mr. Henson never heard back from Mr. Tracy regarding marketing KMOR. *Id.* p. 42-43.

TBC contends Spectrum Scan breached the Agreement by ceasing any efforts to market KMOR for sale after February 1, 2006. Spectrum Scan argues any failure to continuing marketing KMOR was reasonable based on Mr. Tracy's conduct. Specifically,

Spectrum Scan based its decision to discontinue marketing on Mr. Tracy's lack of communication with Mr. Henson and Spectrum Scan, Mr. Tracy's lack of interest in selling KMOR, and Mr. Tracy's partnership with others regarding KMOR's operation. When TBC began operating KMOR the dynamic of the project changed as the construction permit was no longer for sale. **See** TR. 422-423.

The parties entered into a binding written agreement on February 14, 2004. The issue before the court, then, is whether either party committed a material breach of the contract so as to excuse performance by the other party. Alternatively, TBC contends its performance to sell KMOR under the Agreement has not yet been triggered by the emergence of a highest offeror for a reasonable price within a reasonable time period. The provisions requiring the parties to market KMOR and requiring TBC to sell KMOR to the highest offeror are material terms of the parties' agreement. These terms are primary to the essential purpose of the Agreement. Accordingly, any breach of these terms would constitute a material breach of the Agreement.

On August 12, 2005, TBC received an offer for the purchase of KMOR for $3.5 million. **See** Ex. 58. The offer was in the form of a Letter of Intent. *Id.* TBC now claims the amount of the offer was not reasonable. At a minimum, TBC argues, it was entitled to rely on Spectrum Scan's representations that KMOR would sell for between $4 and $6 million, when determining whether any given offer was reasonable. **See** Filing No. 148 - Brief p. 49. The facts contradict TBC's contentions. At the time of the offer, Mr. Tracy specifically requested $3.5 million for KMOR. **See** Ex. 235 - Henson Depo. p. 51; **see also** *id.* p. 81-82; TR. 267. Mr. Tracy did not object to the Letter of Intent based on the price. Additionally, although the offers for KMOR had been rising in price, the parties and Mr. Henson acknowledged the original value assumptions had been mistaken. Finally, the evidence shows TBC pursued options other than the sale of the KMOR license and construction permit, even at the time the August 12, 2005 Letter of Intent was pending.

TBC contends the August 12, 2005 Letter of Intent does not constitute a satisfactory definitive purchase agreement necessary to create a binding contract and the sale of KMOR. Thus, TBC argues the Letter of Intent cannot constitute an offer. In contrast, the overwhelming evidence in the record shows the use of a letter of intent was the standard

first procedure in the industry for sale of a broadcast license.  Further, Mr. Tracy himself referred to other bids for purchase of KMOR made in letters of intent as offers.  Finally, the Agreement does not require a particular form any particular offer must take, nor does it require any offer be made by use of a definitive purchase agreement or other binding instrument.

TBC's failure to act on the August 12, 2005 Letter of Intent did not rise from a valid or reasonable objection to the form or terms.  Such is evident by Mr. Tracy's failure to take Mr. Henson's advice about making a counteroffer related, not to price, but to the exclusive dealing clause.  Accordingly, TBC's failure to proceed with the highest and reasonable offer made on August 12, 2005 constitutes a material breach by TBC of the Agreement.  This conduct and Mr. Tracy's conduct surrounding the August 12, 2005 Letter of Intent and thereafter relieved Spectrum Scan of its duty to continue to market KMOR for sale.

The court's finding of TBC's breach of the Agreement in August of 2005 obviates the need to determine the merits of Spectrum Scan's claims based on fraudulent conveyance and quantum meruit.  Further, such finding precludes TBC's claim for a set-off of its expenses incurred after the breach.  Finally, the court makes no finding of fraud in connection with Spectrum Scan's counterclaims, specifically Count 2 and Count 4, accordingly punitive damages will not be considered.

### E.   Damages

Spectrum Scan argues the damages should be the amount Spectrum Scan would have received under the Agreement if TBC sold KMOR based on the August 12, 2005 Letter of Intent.  **See** Filing No. 149 - Brief p. 56.  Accordingly, Spectrum Scan asserts the amount of damages is 40% of $3.5 million, or $1.4 million.  *Id.*  Further, Spectrum Scan contends this is a liquidated damage amount because the amount was defined by contract.  *Id.*  On this basis, Spectrum Scan also seeks prejudgment interest.  "The longstanding rule in [Kentucky] is that prejudgment interest is awarded as a matter of right on a liquidated demand."  *3D Enters. Contracting Corp. v. Louisville & Jefferson County Metro. Sewer Dist.*, 174 S.W.3d 440, 450 (Ky. 2005).

TBC does not contest Spectrum Scan's calculation of damages for breach of contract. Nor does TBC contest the amount is liquidated. However, TBC repeatedly argued the August 12, 2005 Letter of Intent could not constitute a legitimate offer because it would not be, if signed by TBC, a binding contract for the sale of KMOR. TBC's argument does not diminish the facts that the individuals involved all agreed the price was reasonable. Further, Mr. Tracy's conduct in failing to proceed on the August 12, 2005 Letter of Intent resulted in a material breach of the Agreement. There is no evidence before the court showing the August 12, 2005 Letter of Intent was anything other than a serious offer for the purchase of KMOR for $3.5 million.

"The measure of damages for breach of contract is 'that sum which will put the injured party into the same position he would have been in had the contract been performed.'" *Hogan v. Long*, 922 S.W.2d 368, 371 (Ky. 1995) (internal citation omitted); see *Francis v. Nami Resources Co., LLC*, No. 6:04-510, 2008 WL 5169561, at *5 (E.D. Ky. Dec. 9, 2008) (Slip Copy). Had TBC performed as it had contracted to do, Spectrum Scan would likely have received its commission based on the sale of KMOR for $3.5 million. Spectrum Scan is therefore entitled to damages in the amount of $1.4 million. Because these damages were defined by the contract, the amount is liquidated, and Spectrum Scan is entitled to prejudgment interest from the time performance on the amount was due, September 30, 2005, at a rate of 8% per annum. See *Francis*, 2008 WL 5169561, at *2. "Where a debt is liquidated, a successful [party] is 'entitled to interest at the legal rate of eight percent (8%) per annum.'" *Poundstone v. Patriot Coal Co., Ltd.*, 485 F.3d 891, 903 (6th Cir. 2007) (**quoting** *Pursley v. Pursley*, 144 S.W.3d 820, 828 (Ky. 2004)); Ky. Rev. Stat. Ann. § 360.010(1).

### F. Personal Liability

Spectrum Scan contends the court should find Mr. Tracy personally liable based on his actions intentionally breaching the Agreement. **See** Filing No. 149 - Brief p. 51-52. Mr. Tracy opposes personal liability noting this is the first time Spectrum Scan has raised the issue. **See** Filing No. 150 - Reply p. 16-17. Spectrum Scan did raise issues related to Mr.

18

Tracy's personal liability in its counterclaims.  However, Spectrum Scan has not previously raised the issue of "piercing the corporate veil".  Spectrum Scan states this is because the fact that Mr. Tracy is the sole shareholder of TBC was only determined at the time of trial.  The Pretrial Order does contain the unresolved issue of whether Mr. Tracy actively and intentionally avoided TBC's obligations under the Agreement.  **See** Filing No. 122 - PTC ¶ B.  The court finds that this language from the Pretrial Order, construed liberally, covers the theory of recovery against Mr. Tracy personally.  In any event, the court finds Spectrum Scan has failed to show Mr. Tracy's conduct justifies piercing the corporate veil to attach liability personally.  **See** *White v. Winchester Land Dev. Corp.*, 584 S.W.2d 56, 61-62 (Ky. Ct. App. 1979).  Although Mr. Tracy was the sole shareholder and the person making the decisions which impacted the parties in this case, the evidence does not suggest TBC was a mere instrumentality of Mr. Tracy or that their separateness had ceased.

## CONCLUSION

The court concludes TBC and Mr. Tracy's conduct surrounding the August 12, 2005 Letter of Intent constituted a material breach of the parties' February 14, 2004 agreement.  Further, such conduct relieved Spectrum Scan of its duty to continue to market KMOR for sale.  Because of TBC's breach of the Agreement, TBC is liable to Spectrum Scan for the amount which would have been due to Spectrum Scan under the Agreement had the August 12, 2005 Letter of Intent resulted in the sale of KMOR for the price offered.  As the contract amount represents a liquidated damage, Spectrum Scan is also entitled to prejudgment interest at 8% from September 30, 2005.  The parties remaining claims are dismissed.  Upon consideration,

**IT IS ORDERED:**

1.   Judgment will be granted in favor of the defendant Spectrum Scan and against the plaintiff TBC on the defendant's counterclaim for breach of contract in the amount of $1,400,000, with prejudgment interest at 8% per annum from September 30, 2005.  Judgment will be granted in favor of the plaintiff and Mr. Tracy and against the defendant on Spectrum Scan's remaining claims.

  2. Judgment will be granted in favor of the defendant and against the plaintiff on the plaintiff's claims.

  3. The defendant's oral motion for judgment as a matter of law is denied.

  DATED this 23rd day of January, 2009.

            BY THE COURT:

            s/ Thomas D. Thalken
            United States Magistrate Judge